The Honorable Judges of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this honorable court are admonished to draw near and give their attention as the court is now sitting. God save the United States and this honorable court. All right, good morning everyone and thank you for your cooperation and assistance in handling this set of arguments remotely. For our first case today, Lesiv v. Illinois Central Railroad, appeal number 21-2496. We have Ms. Fell for the appellant and Mr. Lipschultz for the appellee. Can you both see and hear me all right? Yes. Yes, Your Honor. Okay, great. Ms. Fell, go ahead. Thank you, Your Honor, and may it please the court. My name is Renee Fell and I represent the plaintiff appellant, Nazari Lesiv. The district court in this matter erred in granting summary judgment on Mr. Lesiv's claim. The district court erroneously held that Mr. Lesiv precluded from asserting a third-party retaliation claim stemming from his brother Lugomir's case against the same defendant simply because Mr. Lesiv also engaged in protective conduct himself. However, Title VII and the precedential cases in this circuit do not provide that third-party retaliation and more standard retaliation claims are mutually exclusive theories of recovery. Instead, these alternate theories of recovery are for a jury to determine whether both or either forms of retaliation occurred. Here, Mr. Lesiv clearly falls within the zone of interest protected by Title VII. As I had mentioned, his brother Lugomir filed discrimination claims against this defendant and in turn this defendant retaliated against my client. Secondly, Ms. Fell, in terms of the time frame there, is it about one year between the filing of the brother's Cook County Circuit Court suit and the activity here and about four months or so between the deposition by your client in his brother's case and the activity here? Roughly, Your Honor. I believe that Lugomir's case was filed in the fall of 2017 and the actions at issue here occurred in July of 2018 and you're correct. The deposition occurred in April of 2018 and the actions at issue occurred in July of 2018. Was there anybody at the railroad who knew about the deposition? Other than Mr. Lesiv, I'm not sure. So, why don't you elaborate for us then this idea of retaliation if nobody at the railroad knew about the fact that your client had been participating in his brother's suit? Well, Your Honor, the supervisors at issue in this case, Anthony Greyer and Daniel Dugan, were accused in Lugomir's case of, in Mr. Dugan's case, harassing Lugomir and in Mr. Greyer's case, retaliating against Lugomir. Both of these individuals knew that Lugomir and Mr. Lesiv were brothers and they were aware that Lugomir had filed a case against the railroad. Here in this case, Mr. Dugan testified at a deposition for Lugomir's case and Mr. Greyer testified at a deposition for Lugomir's case. So, they were well aware of Lugomir's case against the railroad and they were also very well aware that Lugomir and Nazari were brothers. Do we know the timing of those two depositions that you just mentioned? So, Mr. Dugan's deposition occurred in August or September and Mr. Greyer's deposition occurred later that fall. In the year you're referencing? That's correct. However, at the time... I'm sorry, the year that those months that you referenced was in, was it talking about 18 or 17? 18, that's correct. 18, all right. But Ms. Fell, the fact that no one knew Lesiv had testified in a deposition in his brother's case, that's not fatal to your third-party retaliation claim, correct? Just your first-party retaliation claim. Your Honor, it is not fatal to our third-party retaliation claim because that is correct. As I mentioned, the actors at issue were aware that Mr. Lesiv and his brother Lugomir were related. And secondly, when the district court analyzed whether Mr. Lesiv was subjected to a materially adverse action, the district court applied the standard that is typically applied to discrimination claims, while Title VII provides for a more lenient and general standard to be applied to retaliation claims. Specifically, the standard applied to retaliation claims is whether a reasonable person would be dissuaded from making or supporting a charge of discrimination. Here, the district court cited the Hackett v. South Bend case to cite a definition of materially adverse action as a list including things such as termination, demotion with a pay cut, things that would significantly alter an employee's responsibilities. This definition is the definition that is applied in the discrimination context. As I had mentioned in the retaliation context, it is intentionally the more general standard, something that would dissuade a reasonable person from engaging in protected activity. Notably— Ms. Bell, isn't it pretty clear in our precedent that a suspension without pay is an adverse action, even on a discrimination claim, let alone a retaliation claim? That is correct, yes. Could I ask you what the damages look like in this case? In this case, the damages involve emotional distress damages. Here, Mr. Lessev was required to accept a job assignment that was incredibly dangerous and could have even risked his own life. In addition, he is also seeking punitive damages, which are recoverable under the statute. And he could also seek an injunction against the defendant prohibiting them from engaging in similar conduct in the future, as well as injury. There's no lost income in the end? That is correct. Can I ask a clarification about that, Ms. Bell? Was Mr. Lessev suspended without pay at the outset and then he later received back pay, or was he suspended with pay? There's some confusion in the record. Yes, Your Honor. He was suspended without pay at the outset, and then when he was reinstated, he received his full back pay. And at the time he was suspended, he knew the suspension was going to be for two days, right? He did not know that, Your Honor. He was just informed by Mr. Dugan that he was being pulled out of service, and he did not know when he would be returning until he was contacted and asked to return to work. Ms. Bell, could you address the Supreme Court's decision in Clark County School District against Breeden with respect to the timing issues here? I apologize, Your Honor. I am not familiar with that case. I thought it was cited in the defense brief. Okay, there's no point in trying to answer it then. So let me ask, if I could, the defendant says in its response regarding the July 7 work assignment issues, that this was all just a misunderstanding and Plaintiff was too impatient, in essence, protested before the problem could get straightened out. A couple of questions about that. First, would Plaintiff have had any objection to working on the RIP track that day if he had been assigned with Mr. DeLange as part of a two-person team? Your Honor, Mr. Lessig would not have had an objection to taking the RIP track if he had assigned to work with Mr. DeLange. And on this issue, there are some key issues of credibility. During his deposition and during the depositions of several of Mr. Lessig's co-workers who were present that day on the RIP track, Mr. Lessig did not outright refuse this assignment. He asked Mr. Cisneros, the supervisor communicating these assignments, numerous times, who is my partner? And Mr. Cisneros finally told him, I have nobody. And when Mr. Lessig asked Mr. Cisneros, who assigned me to work on the RIP track without a partner, Mr. Cisneros responded that it was Anthony Breyer, who was not present at the time. So it was only at that point that Mr. Lessig flatly refused to work on the RIP track assignment because he knew he would not have a partner and therefore could not safely take that assignment. And so that is why he wanted to address this with Mr. Dubin, because he believed that Mr. Dubin could perhaps address the situation. And the other co-workers who were there testified at their deposition similarly, that Mr. Lessig did not outright refuse this RIP track assignment and rather asked numerous times who his partner was before he finally decided and communicated that he could not accept that assignment because it was very unsafe. And if there are no questions at this time, I would like to reserve the final five minutes for rebuttal argument. All right. Thank you very much, Ms. Fell. Mr. Lipschultz. Good morning, and may it please the Court, Noah Lipschultz, Deputy Attorney General. Your Honors, this is not a third-party retaliation claim in the sense that the Supreme Court described it in Thompson v. North American Stainless. In Thompson, the issue was whether a plaintiff who did not engage in any protected activity under Title VII could have a cause of action based on an adverse action taken towards that plaintiff to retaliate against a close family member who did engage in protected activity. In that case, it's Beyonce who had filed an EEOC charge while she was working for the same employer. And the Court said, yes, if you have a close family relationship, and if your employer retaliates against your close relative in order to punish the close relative who engaged in a protected activity, that that is a case under Title VII for retaliation. So if that theory applies to this particular case, then it is Illinois Central retaliating against Lubomir Lessev by taking adverse action against his brother, Nazari. And the problem with that is Lubomir Lessev had not been employed for almost two years. At the time this incident occurred in July of 2018, Lubomir Lessev had been gone from litigation that he had filed well before this incident took place in July of 2018 that Doug Brennan was asking about. There are simply no facts that anybody at the railroad was taking adverse action against Naz Lessev who attacked Lubomir. It just doesn't fit that fact pattern. Now, Mr. Lessev is arguing in this case that his own protected activity, and April of 2018, and he is claiming retaliation based on that protected activity. So it's a direct retaliation claim under Title VII. The problem, as was made clear in the briefing in Ms. Fell's answer, is nobody at the railroad who was involved in this situation knew anything about Mr. Lessev testifying in his brother's case. It's undisputed in the record. So his claim fails for that reason alone, and the district court got it right when it dismissed the claim on summary judgment for that reason. Additional reasons for affirming the district court's ruling include that there was no adverse action here. There was some discussion about the nature of the suspension. This court has precedent in the Nichols v. Southern Illinois University case that a three-month paid suspension was not an adverse action. I was troubled by that, Mr. Lipschultz, because you cited several cases, both from our court and district courts within the circuit, to the effect that a paid suspension is not necessarily an adverse action. Those arose in the context of law enforcement officers who got administrative leave of some sort while investigations were ongoing, and that's a pretty common. But I would have thought our case law is very clear that a suspension without pay, which is what this was at the outset, is not. It rather clearly qualifies as an adverse action, even for a discrimination claim, let alone a retaliation claim. Your Honor, in terms of that issue, in looking at Burlington v. White, which sets the stage for adverse action in this kind of context, you had a 37-day suspension that was without pay, where the plaintiff didn't know if she was ever going to be reinstated or if she was ever going to be paid, and the court held that that, yes, was an adverse action sufficient. Here, you have literally two work days. So the question is whether that would... Well, first of all, do you agree that it was unspecified at the time that it began how long it would last? I agree with that. You agree with that? Okay. So the question is, would a reasonable person be dissuaded from engaging in protected activity by that prospect? Are you familiar with the surveys the Federal Reserve Bank has done in recent years on the proportion of families in the United States or say they could not handle a $400 emergency expense? I'm not familiar, Your Honor. It's been pretty widely publicized, and the numbers range between 30 to more than 40% of U.S. households say they could not handle $400 emergency expense. I'm thinking, I don't know exactly how much Mr. Less have earned per day, but I would think even a two- or three-day suspension would likely inflict more than a $400 out-of-pocket loss unless and until he gets back pay weeks or months later. I would think that might pose at least a jury question as to whether that's sufficient to dissuade people from speaking up, testifying, et cetera. I think it's fact-specific, Your Honor, and I agree that the longer the suspension goes and the longer the period of time in which your status is uncertain as to either whether you'll be paid or whether you'll be returned to work, there's a point where that crosses that line to be materially worth. I just don't think it's at two days. That's the difference here. Why not? Why not? Because first of all, on the railroad, it's not uncommon for people to be pulled out of service pending a formal collective bargaining investigation. That's part of the process. And I think when you're only off for two days and you're called back to work, the idea that you're going to be dissuaded from engaging in protected activity just doesn't hold. I don't know what the math formula would be for how many days reach that level, but I don't think it's two days when you're informed promptly on the third day that you're back to work with pay. Would you agree that in applying the retaliation standard for adverse activity, we need to think about the problem ex ante? That is, I'm trying to decide whether to cooperate with this case, whether to testify, whether to provide an affidavit, etc. And I wonder how my employer might react to that. And I see that in the next case, I see that Mr. Levis got suspended indefinitely and wound up being two days off. So I agree, Your Honor. What you just articulated in my mind is, is the reasonable, would it dissuade a reasonable worker from engaging in protected activity? I agree with you that that is the standard. So why is any suspension? The argument you're making assumes we're doing this because you are giving this testimony, because you gave that affidavit, because you appeared for a deposition. Why is any suspension tolerable under the law? Well, I'm just, again, I'm going off of this, this court's precedent, which held that a paid administrative leave, which is, we're not talking about paid administrative leave. So I'm sorry. Why is any unpaid suspension tolerable under the law? I don't think explicitly, explicitly for retaliatory purposes, because we have to assume that for purposes of your argument on this issue. Well, I don't think we should assume that at all, because Mr. Dubin, who pulled him from service had no knowledge of the protected activity. That's a different causation is an entirely different issue. You're arguing that his managers were entitled to suspend him without pay for explicitly retaliatory purposes under the law. We're arguing that under the specific facts here, a two-day suspension is not a materially adverse action. That is not. I understand you have no support for that, and I understand your position. Could we also talk about the comparison with Mr. Barwan? If I understand this correctly, we've got the same decision maker, right? Mr. Dugan? We don't have the same decision maker. Sorry. Sorry. Have I got the wrong guy? Is it Dugan? Well, no. Dugan knew about both Barwans and Les' conduct, right? He knew about what was reported to him by Cisneros? Right. Regarding both gentlemen. Right. We've got essentially the same rules. We've got similar conduct in terms of resisting work assignments and mouthing off in response to supervisors, right? I wouldn't agree that the conduct was similar, Your Honor. Well, if I understand your argument to be that everybody knew that Barwan dropped lots of F-bombs on the job and nobody took all that very seriously, my problem with that argument is that sounds an awful lot like what we said in Coleman was a jury issue. If you may recall from the Coleman opinion, the comparators there were explained away by the defense as, oh, they were just engaging in horseplay when somebody put a knife to somebody else. And we said, fine, make that argument to the jury. You don't get summary judgment by offering that explanation. Could you differentiate the situations here? Yeah. I mean, I think that there's a couple points of differentiation here. In Coleman, the conduct which the employer did not address by way of discipline was qualitatively more serious than the conduct for which they disciplined the plaintiff, number one. In her case, in Ms. Coleman's case, she told the therapist that she wanted to kill her supervisor. Right. So there wasn't a direct threat towards a coworker the way there was in the individuals that held the knife to the throat. So there was a huge qualitative difference in the conduct at issue. And it made no sense why the employer would treat those two situations differently. We need to back up a step here and remember. Well, the employer offered a reason. They said the knife was just horseplay. Nobody took it seriously. That was viewed as incredible in a situation where the employer, first of all, knew about the protected conduct in that case, didn't know about it here. And what you're dealing with here is Mr. Cisneros' perception more than Mr. Duvitt. Mr. Cisneros had a perception of Mr. Lessive's conduct on the day in question that he was being argumentative, that he wouldn't let him finish his assignments. And Mr. Lessive said, I demand that this be escalated to a manager. Had a phone call with Mr. Duggan that Mr. Duggan perceived as hostile in the first instance. And he said, we got to cool this down. You need to be pulled from service. Now let's look at Mr. Barwin. Okay. Mr. Barwin was given an assignment by Mr. Cisneros. He said, F that. I don't want to go work there because I haven't worked in that yard in five or six years. He was smiling. He was laughing. Mr. Cisneros did not escalate that to anybody at the time that it happened. Several days later, Mr. Barwin had a discussion with Mr. Duggan where Mr. Duggan asked him, did you, did you curse at a supervisor? And Mr. Barwin said no. And Mr. Barwin was not insubordinate, did not raise his voice with Mr. Duggan. So there's a lot of differences. And regardless of those differences, they could not have been motivated by Mr. Less's protected activity. We lose sight of that in this discussion. Well, actually, no, we don't. The problem that I'm having is with your offering these as independent arguments for affirmance. And I had, that's my problem with the adverse action. And it's also my problem with the causation point. And, and you're entitled to retreat to that. But I have a big problem with the treatment of the, of the comparator as something that could be decided here as a matter of law. On the, could I ask you one other question about the, this July 7 work assignment problem? And that is, I understand your position to be that, that Mr. Less was going to be assigned to work with a partner, Mr. DeLang. And it was only the late call off by DeLang that would have produced this dangerous assignment to work alone. What do we make of Greyer's, the evidence that explain that, that Mr. Less's July 7th assignment was because of his attitude the day before. That doesn't sound like something that depends on the late call off. So, and the document you're referring to is Mr. Greyer's interview with human resources, where the human resources manager who conducted the investigation asked Mr. Greyer, why did you assign Mr. Less to work the group? He did not say, why did you assign him to work alone at the RIP? And that's been the problem throughout is he perceived himself as being assigned alone. Mr. Greyer assigned him with Mr. DeLang and that is per Armando Cisneros testimony where they were the ones that discussed the assignment before the shift. Mr. Greyer told human resources, I assigned Mr. Less to the RIP track because he had an attitude the day before. And it's in the record that the two of them had a work related conflict about the pace of work and the completion of work the day before. Yeah. Okay. But why would that even, why would working with DeLang be the kind of thing that you would do because of an attitude the day before? I thought that was part of his routine, just routine work. It was part of his routine work. I mean, I don't want to speculate as to why Mr. Greyer had that to HR, but what I will say is this, and I see my time is up. So if I, if I maybe finish working, the RIP track is a normal part of his job duties, working the RIP track alone is not. And that's why when he raised it with Mr. Dugan, Mr. Dugan immediately said, that makes no sense. You can't physically work the RIP by yourself. So it would make no sense to deploy you there. Why don't you go work somewhere else? Can we get you a partner? And so what we are really dealing with here in closing is confusion about the status of this work assignment for a period of minutes until he got on the phone with Mr. Dugan and Mr. Dugan said, yeah, that makes no sense. You would never go to the RIP by yourself because you physically can't do the work. And he corrected the issue. And this is, this is the decision maker that they're claiming retaliated against him. I have a few questions. So yeah, my colleagues have questions to follow up. Please go ahead. Thank you. I need to get some clarity, Mr. Lipschitz, on this third party argument that you're making, because it seems to have changed from your brief. In your brief, you argued that Mr. Lessef couldn't make a third party retaliation claim because as you read Thompson, the railroad didn't retaliate against him by harming someone else. You've since changed that this morning, which I think is the correct course of action to read Thompson correctly. And now you've said this morning that the reason he can't make a third party retaliation claim is because his brother is no longer employed at Illinois Central. So my question for you is, did you cite for us case law that there's no scenario in which there can be retaliation against an ex-employee under Title VII that would dissuade a current employee who has close association with that ex-employee from engaging in statutorily protected activity, or rather, that would dissuade that ex-employee or future employees from suing because they know someone they're associated with, who remains employed, could experience retaliatory action? Did you cite for us something? Because I don't see it. No, I didn't, Your Honor, because I'm not aware of any scenario, and Thompson certainly didn't involve this scenario, where the allegation was that an ex-employee was the one who the current employees and the employer terminates or takes adverse action against one to punish the other for their protected activity. But I'm unaware of any case where somebody who's been gone for two years could essentially be the target for retaliation by proxy due to actions taken toward the close relative. If there are cases out there, I apologize, Your Honor, I'm unaware of them. But I don't think, regardless, there hasn't been any such showing in this case that there was any kind of motivation or connection between Mr. Lubomir Lessev's lawsuit and what happened with Mr. Naz Lessev in July of 2018. If there are no further questions, Mr. Lipschultz, thank you very much. We'll hear rebuttal from Ms. Fell. Thank you, Your Honor. Briefly, Your Honor, I would like to address Judge Jackson's last point. I do not have the case in front of me, but I believe in the Burlington case, when the court was considering the materiality of the element, it noted that it is specifically very general. And I believe that the court even noted that it is possible for an employer to continue to retaliate against an employee even after their termination. Okay, the retaliation against ex-employees is possible. How it fits in with this scenario is what Judge Jackson was asking about. Okay, thank you, Your Honor. Additionally, I would like to go back to the similarly situated analysis. In this situation, there is reason to believe that Mr. Dugan's proffered reason for issuing an unpaid suspension to Mr. Lessev is dubious. First of all, he initially assigned Mr. Lessev to work on a light repairs assignment, which he could have safely completed, and only decided to issue an unpaid suspension to Mr. Lessev after Mr. Lessev noted his interaction with Mr. Greer the day before. Additionally, Your Honor, as far as the incident involving Mr. Barwin the previous day, Mr. Barwin testified at his deposition that he was not smiling when Mr. Cisneros assigned him to work on the A yard and he was not laughing. Finally, Your Honor, I would like to address the U.S. Supreme Court case, the Clark case, if I may. In the Clark case, there was, as far as I can tell, no evidence that the actor continued to be involved in previous charge of discrimination against the employer. Here in this case, there's evidence that Mr. Dugan continued to be involved in Lubomir's case up to the days it issued, July 6th and 7th of 2018. Mr. Dugan attended a fact-finding conference at the Illinois Department of Human Rights. He testified at a deposition. Mr. Dugan was named in the complaint in several incidents involving harassment, discrimination, and retaliation against Lubomir Lessev, Mr. Lessev's brother, and so it is fair to say that Mr. Dugan was involved throughout that case, and so Mr. Dugan's knowledge, rather, of Mr. Lubomir's case did not end at the Illinois Department of Human Rights investigation. It continued up until the dates of the adverse action. And if there are no further questions, I ask that this Court reverse the District Court's grant summary judgment and remand for further proceedings. Thank you for your time. All right. Thanks to both counsel for your helpful arguments this morning.